ANNA THEISEN ET AL., APPELLEES, V. JOHN PETERSON, APPELLANT.

FILED DECEMBER 30, 1925.  No. 23485.

Mortgages:  FORECLOSURE:  EFFECT OF STAY.  "The taking of a stay of sale at the time or after a decree is entered, granting foreclosure of a mortgage and appointing a receiver, waives all previous errors which may have occurred in appointing the receiver, as well as in granting the foreclosure."  *Lackey v. Yekel*, 113 Neb. 382.

APPEAL from the district court for Pierce county: ANSON A. WELCH, JUDGE.  *Affirmed.*

*Spillman & Muffly, C. H. Kelsey* and *Lloyd Dort,* for appellant.

*Douglas Cones* and *M. H. Leamy, contra.*

Heard before MORRISSEY, C. J., DEAN, DAY, GOOD, THOMPSON and EBERLY, JJ.

DAY, J.

On June 2, 1921, Anna Theisen brought an action in the

Theisen v. Peterson.

district court for Pierce county against John Peterson to foreclose a chattel mortgage for $16,000, alleged to have been given to her by Peterson to secure a note of like amount due January 1, 1922.  The mortgage covered certain live stock, grain and farm machinery.  The plaintiff based her right to foreclose upon the alleged ground that Peterson had disposed of a part of the mortgaged property; that the property was not being properly cared for and that there was danger of the security being lost.

The Security State Bank intervened, claiming that it was the holder of the note and mortgage; that it held them as collateral security for certain notes executed to the bank by Anna Theisen and Casper Theisen aggregating $15,900. In addition to the foreclosure the plaintiff, as well as the intervener, prayed that a receiver be appointed to take charge of the mortgaged property.  Later the Security State Bank commenced an action in the district court for Pierce county against John Peterson to foreclose a real estate mortgage of $54,000 upon a half section of land in Pierce county.

Peterson filed answers in the two actions, alleging in substance that the notes and mortgages were given as a part of a transaction between himself and Casper Theisen, wherein the parties were making an exchange of their respective properties.  Peterson was exchanging his equity in certain lands, live stock and farm implements, located in Harrison county, Iowa, which, for the purpose of trade, were valued at $40,235, for Theisen's equity in certain lands, live stock and farm implements, located in Pierce county, Nebraska, which, for the purpose of exchange, were valued at $108,235.  To adjust this balance Peterson gave a chattel mortgage of $16,000 and a real estate mortgage of $54,000. The mortgage was given for $54,000 instead of $52,000 to adjust some difference which subsequently arose.  Peterson further alleged that as inducement to making the exchange Theisen made false and fraudulent statements upon which Peterson relied in making the exchange; that, by reason of

the false and fraudulent statements made by Theisen, Peterson claimed that he was damaged in the transaction in an amount in excess of the two notes. The answer further alleged that the bank was not a *bona fide* holder of the notes; that, while Anna Theisen was named as payee in the notes, they were in fact owned by Casper Theisen, and that Anna Theisen paid no consideration for having the notes and mortgages made payable to her. Peterson prayed that the notes and mortgages be canceled, and that he have personal judgment against Theisen for the amount of his damages after deducting the amount of the canceled notes. In the answer Peterson also asked that a receiver be appointed to take charge of the property covered by the chattel mortgage.

While the cases were pending the chattel property was sold by the receiver, and upon an order of the court $8,452.08 was turned into court.

The two cases were consolidated and tried on January 26, 1923, but for some reason the decree was not entered of record till April 30, 1923. The decree found that the bank was a *bona fide* owner of the $16,000 note and mortgage and also the $54,000 note and mortgage; that while the instruments appeared upon their face to have been executed January 1, 1921, they were not in fact executed till February 25, 1921; that before the $16,000 note was transferred to the bank as collateral security a payment of $1,400 had been indorsed thereon as of the date of its execution. The court further found that the indebtedness of Anna and Casper Theisen for which the collateral notes were given amounted to $16,509.45. The court ordered that $7,000 of the amount paid into court by the receiver should be credited upon the $16,000 note and after deducting the credit of $1,400 indorsed thereon found that there was a balance due on the $16,000 note of $9,983.12. The court further found that there was due upon the $54,000 note the sum of $63,003.80 and decreed a foreclosure of the real estate mortgage. The court found against Peterson upon the issues presented by his answer and cross-petition. The

court further found that, after satisfying the amount due the bank, the balance of the proceeds of the sale should be paid to Anna Theisen to the extent of the amount found to be due her, and that the surplus, if any, should be paid to John Peterson, and entered decree accordingly. From this decree Peterson has appealed.

At the outset we are met by the objection, on the part of the Security State Bank and Anna Theisen, that we are precluded from examining the issues presented by this appeal, because Peterson had filed, following the decree, a request for a stay of the order of sale. The record shows that on February 15, 1923, Peterson filed a request for a stay of the order of sale as provided in section 8988, Comp. St. 1922. The mere filing of this request, as a matter of law, operates as a stay of the order of sale for a period of nine months, without any action of the court. Section 8991, Comp. St. 1922, which refers to a stay of an order of sale in foreclosure proceeding, in so far as applicable to the present discussion, provides as follows: "No proceedings in error or appeal shall be allowed after such stay has been taken."

The question presented by the objections of the appellees has been several times considered by this court. In *Lackey v. Yekel*, 113 Neb. 382, it was held: "The taking of a stay of sale at the time or after a decree is entered, granting foreclosure of a mortgage and appointing a receiver, waives all previous errors which may have occurred in appointing the receiver, as well as in granting the foreclosure." In *Ecklund v. Willis*, 42 Neb. 737, it was held that the filing of a stay of sale is a waiver of the right to have reviewed any of the proceedings in the case prior to the taking of such stay. In *Gilbert v. Provident Life & Trust Co.*, 1 Neb. (Unof.) 282, it was held: "When defendants in a suit to foreclose a mortgage avail themselves of the statutory stay of judgment, they are estopped from attacking such judgment in any manner." It would seem that, by the plain provisions of the statute, as well as our decisions construing the same, we are precluded from examining the issues presented by the answer and cross-petition of Peterson.

From what has been said, it would seem to follow that the judgment of the district court should be, and it is,

AFFIRMED.

The following opinion on motion for rehearing was filed November 19, 1926. *Former judgment of affirmance vacated, and judgment of district court reversed, with directions.*

1. Appeal: MORTGAGE FORECLOSURE: REQUEST FOR STAY. In an action to foreclose a real estate mortgage, a request for stay inadvertantly filed before the decree is entered of record will not preclude a review of the case upon the merits.

2. ———: STATUTE: CONSTRUCTION. A statute denying a right of appeal to this court will be strictly construed, and the proceedings to accomplish that result must comply literally with the terms of the statute.

3. Fraud: REPRESENTATION OF VALUE. In a contract of exchange certain values were placed upon the properties of the respective parties for the purpose of determining the difference to be paid by one to the other. *Held*, that such valuation was not binding upon either party in an action for fraud.

4. ———: EXCHANGE OF PROPERTIES: MEASURE OF DAMAGES. Where a contract of exchange has been procured by the fraud of one of the parties, and the other seeks to recoup his damages in an action to foreclose a mortgage given as a part of the transaction, the measure thereof is the difference between the actual value of the property transferred and its value if it had been as represented at the time of the contract of exchange.

5. Evidence examined, and *held* to establish fraud in procuring the contract.

Heard before MORRISSEY, C. J., ROSE, DEAN, DAY, GOOD and THOMPSON, JJ., and REDICK, District Judge.

REDICK, District Judge.

An opinion was filed in this case December 30, 1925, affirming the judgment of the court below. A motion for a rehearing was overruled, leave given to file a second motion for rehearing and argument had upon the same. An opinion was then prepared disposing of the case upon its merits, but the same has been recalled and the present

opinion adopted as the final disposition of the case. For a general statement of facts, reference is made to our first decision, *ante,* p. 150, but other facts necessary for the understanding and disposition of the questions presented will be noted. By our first opinion the merits of the case were not discussed nor disposed of, but the judgment of the lower court was affirmed because it appeared from the record that prior to the filing of the appeal in this court the appellant had filed in the district court a request for stay. It was therefore held in accordance with section 8991, Comp. St. 1922, that no appeal was allowable.

In view of the fact that the Constitution of this state provides that the "right to be heard in all civil cases in the court of last resort, by appeal, * * * shall not be denied" (article I, sec. 24), we have reconsidered this question. The facts of record regarding the filing of the request for stay are as follows:  Trial having been concluded December 13, 1922, the case was taken under advisement, and on January 26, 1923, the court orally delivered its decision on the merits; but the decree was not passed and entered of record until April 30, 1923.  On February 14, 1923, defendant filed a supersedeas bond which was approved by the clerk. That the bond was a supersedeas bond is without doubt; it is so recited, the amount fixed by the court at $500, and the condition to prosecute the appeal without delay and pay all costs was all that was required in view of the facts that the personal property had been sold and the real estate in the hands of a receiver.  Under such circumstances a condition against waste is superfluous.  On February 15, 1923, a request for stay in usual form was filed appearing to be signed by John Peterson. May 22, 1923, præcipe was filed in this court.  These proceedings were respectively taken by different attorneys representing defendant, and we think it is justly to be inferred from the record that the request was inadvertently filed and should not defeat the appeal. The existence of the request for stay was not brought to the attention of this court by motion to dismiss the proceedings, nor until the filing of the brief of appellees, May 7,

1924, which discussed the case upon its merits very fully, and the fact of the stay was mentioned only in two lines under propositions of law and five lines in the conclusion of the brief. We are further of the opinion, under the circumstances of this case, that, the request for stay having been filed before entry of the decree upon the record, such irregularity would not destroy its efficacy *as a stay,* *Jenkins Land & Live Stock Co. v. Attwood,* 80 Neb. 806. But by the same liberal construction of a remedial statute, when proceedings are set up to defeat a right protected by the Constitution, they should be regular in all respects. Section 8988, Comp. St. 1922, requires request to be filed "within twenty days after rendition of such decree," and section 8991 provides that "no * * * appeal shall be allowed after such stay has been taken." Where an appeal was required to be taken "within six months after the rendition of the judgment," we held that "rendition of the judgment" meant the entry thereof upon the record. *Bickell v. Dutcher,* 35 Neb. 761. We think they should be given the same meaning here, and that we were in error in holding that the request for stay in this case defeated the appeal. We do not hold that the right of appeal may not be waived, nor that section 8991, *supra,* is unconstitutional, but that the waiver must be intentional, and the statute enforced literally within its terms. We will therefore consider the appeal on its merits.

On the one side, the Security State Bank and Casper Theisen are seeking to foreclose a chattel mortgage for $16,000 and a real estate mortgage for $54,000 and they will be hereinafter referred to as the plaintiffs. John Peterson, purchaser of the Theisen property, files a cross-petition seeking to recoup damage he claims to have sustained by alleged false representations of Theisen as to the quality, quantity and value of the cattle and hogs and the value of the half section of land received from Theisen.

While the record is very voluminous, it is quite unsatisfactory in regard to many material questions. To start with, it may be noted that this was an exchange by Peterson

of two Iowa farms consisting of 184 acres, with the stock and farm implements upon them, for the Theisen farm of 320 acres, with a much larger amount of stock, consisting of cattle and hogs, farming implements, grain, and so forth. The contract signed by the parties recited that Peterson's equity was valued at $40,235 and Theisen's at $108.235. In arriving at these figures each party placed a very much inflated valuation upon his land. There is no complaint as to the valuation of Peterson's chattels, nor upon Theisen's chattels except the cattle, which were valued at $300 a head and the hogs at $50 a head. Eighty acres of the Iowa farm were valued at $300 an acre, and 104 acres at $285, and Theisen's farm at $285 an acre.

It would serve no useful purpose to recite the evidence in detail, but we have examined it with great care and have no hesitancy in stating our conclusion that Peterson was greatly over-reached in the deal and imposed upon by Theisen. At the start of the negotiations, in response to a letter from Peterson's brother, who was a real estate agent in Omaha, Theisen wrote that he had been offered $285 an acre for his land a year ago but had it priced at $300 (no proof of this) ; that his cattle he priced at $325 a head, having sold some the year before at $460 and two years before at $670. He priced his 160 head of good Duroc-Jersey hogs at $10,000, but put in contract at $8,200. He stated that if the deal was made he could guarantee Peterson a sale of 50 head of these cattle the following June for $18,000 or $20,000, and at the February sale, 1921, 50 head of hogs would bring better than $7,000. When Peterson came to look at the Theisen farm, Theisen showed him the record of the sales made by him for the three years previous, which substantiated the statements of his letter and tended to establish the valuations claimed for the cattle and hogs in the contract. That the cattle and hogs were thoroughbreds substantially as represented seems to be established by the evidence; but their value, as thoroughbreds, was entirely dependent upon there being a market for that class of stock; and the evidence establishes that the market began

to fade away early in the winter of 1920, and by spring had practically disappeared. Peterson had no experience in dealing with thoroughbred stock, while Theisen had been in that business for a number of years. Peterson was undoubtedly deceived by the exhibits of prior sales and by the guaranty of Theisen of the amounts which could be realized in February and June following. He was also entirely uninformed as to the value of Nebraska lands and the lands in question, and relied upon the statements of Theisen in that regard. Upon Peterson's first visit to the Theisen farm late in November, 1920, he spent but an hour and made only a cursory examination. Upon his second visit he was there a little longer, an hour and a half or two hours, and counted the cattle and hogs. They then went to a neighboring town and had prepared the contract of exchange, but Peterson refused to sign the same because a note and mortgage for $9,600 which he was to put into the deal was up for collateral with an Iowa bank to secure $2,000. He now says that he refused because the deal looked pretty big to him that morning. Peterson and his brother and Theisen then took the train for Omaha, where Peterson proceeded to get drunk, was arrested, put in jail and the next morning fined. An effort is made to connect Theisen with this incident as the furnisher of the liquor, but the evidence is not convincing. However, the parties stayed in Omaha the following day and on the 10th of December went to Woodbine, Iowa, where the contract of sale was executed, Theisen immediately leaving for home. We do not consider the circumstances of the execution of the contract of great importance, because the mortgages in question were subsequently executed about the 2d of March, 1921, and Peterson took possession of the Thiesen farm about the 15th of January, 1921, thereby waiving any objection upon the ground of his condition at the time the contract was executed. They constitute, however, details in the picture and tend to characterize the final transaction as disclosed by the evidence. The Iowa lands were conveyed to Thiesen and the personal property disposed of by him and about

March 2, 1921, the Theisen lands were conveyed to Peterson and the mortgages in question executed to Anna Theisen, the wife of Casper, but this change is of no legal importance.

June 2, 1921, Anna Theisen began the action to foreclose the chattel mortgage, and later on the Security State Bank, to whom the two mortgages had been assigned as collateral to Theisen's notes in the bank, aggregating about $16,000, intervened, and still later, in January, 1922, filed suit to foreclose the real estate mortgage, and upon application of Peterson and by consent of parties the actions were consolidated and tried together. By consent a receiver was appointed of all property covered by the chattel mortgage and later on a receiver was appointed for the real estate. The chattels were sold under order of the court, netting $8,452.08, $7,000 of which was applied upon the Thiesen notes at the bank. In February, 1921, by consent, the hog sale was held as advertised and 40 sows were sold for $2,375. The situation of Peterson is that within a period of six months he had lost his $9,600 mortgage, his Iowa farms, and all of the chattels which were upon the Theisen farm. A decree of foreclosure for $63,000 has been rendered upon the Theisen farm and a judgment against him for $9,983.12 for the balance of the chattel mortgage note. It would seem that the situation thus presented is so unusual as to cast suspicion upon the methods by which it was brought about.

No complaint is made in the pleadings of false representations as to the value of the Iowa lands; evidence was received as to their real value, but we cannot consider it, as it is not in response to any pleading.

Theisen says he did not represent his land to be worth $285 an acre, but that he priced it at that figure. However, his letter, above mentioned, disputes him on this point. The highest value placed upon the land by two witnesses for plaintiff is $225, while witnesses for defendant put it at $90 to $120, $100 (2), $100 to $125 and $110. It also appears that the only sale in the immediate neighborhood

was at $144 an acre in 1919, and all witnesses agree that there was a decided drop in values beginning with the fall of 1920.

The hogs were lumped at about $50 a head, though the sales in previous years, reports of which were shown Peterson, showed an average of over $150.

The cattle were priced at $300, but as above noted, there was no market for thoroughbreds in December, 1920, and their value was greatly depreciated. No evidence was offered by either side as to the real value of the cattle and hogs as part of the equipment of a stock farm, which is the proper test. Defendant claims that they were only worth what they would sell for on the stock market, but this is clearly incorrect, as defendant was not purchasing for slaughter. Plaintiffs claim that they should not be held responsible for the failure of the market for thoroughbred cattle. The evidence is conclusive, however, that there was no market for that class of cattle in December, 1920, nor for a long time thereafter. While it is true the cattle had a value in excess of the beef price (which defendant figures at $3,354), no direct evidence was offered to show what was such value.

In this state of the evidence, the writer of the withdrawn opinion attempted to fix the value of the cattle by applying to them the same rate of depreciation which the evidence showed had been suffered by the hogs. This is characterized by counsel for appellees as hypothetical and speculative, and we have concluded that the criticism is just. Being without any evidence upon which to base a finding of the market value of the cattle and hogs, we are unable to dispose of the case on the merits and the case must be remanded for further proceedings.

We hold, however, the law of the case to be: (1) That filing the request for stay did not defeat the appeal. (2) That the case of Peterson for false representation is made out, and that he is entitled to recoup his damages in this action. (3) That evidence of the value of the Iowa land and chattels is irrelevant under the pleadings as they now

stand. (4) That the Security State Bank does not occupy the position of a *bona fide* holder for value (this is not seriously contended for in the briefs). (5) That the measure of damages is the difference between the actual value of the property transferred and what its value would have been had it been as represented.

It is therefore ordered that the judgment of the district court be reversed and cause remanded for an accounting of the amount due upon the mortgages in suit in accordance with the principles herein announced, each party being granted leave to file amended pleadings if so advised.

REVERSED.